No. 24-13309

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

ABIGAIL JEAN MARBUT

Plaintiff-Appellant,

v.

MATTHEW PHILLIPS, JOSHUA CASH,
KIRBY COLLIER, and JUSTIN PENA

Defendants-Appellees

---

**BRIEF OF THE APPELLANT**

---

On Appeal from the United States District Court for the Northern District of
Georgia, Case No. 2:22-cv-00776-VMC

Wayne B. Kendall
Wayne B. Kendall, PC
155 Bradford Square, Suite B
Fayetteville, GA 30215
Phone: (770) 778-8810
Facsimile: (770) 716-2439
wbkendall2@yahoo.com

Jeffrey Reeves
The Reeves Law Firm, LLC
506 North Pinehill Road
P.O. Box 544
Fayetteville, GA 30212
Phone: (678) 727-6856
Facsimile: (888) 209-5048
jareeveslaw@gmail.com

*Counsel for Appellant Abigail Jean Marbut*

## CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATEMENT OF APPELLANT ABIGAIL JEAN MARBUT

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellant Abigail Jean Marbut hereby respectfully submits the following list of judges in the trial court and all attorneys, persons, associations of persons, firms, partnerships, or corporations having an interest in the outcome of this matter:

Wayne B. Kendall, Counsel for Appellant;

Jeffery A. Reeves, Counsel for Appellant;

Jason Waymire, Counsel for Appellees;

Terry Eugene Williams, Counsel for Appellees;

Officer Matthew Phillips;

Officer Joshua Cash;

Officer Kirby Collier;

Officer Justin Pena;

Hon. Victora Marie Calvert, United States District Court, Northern District of Georgia

Pursuant to Eleventh Circuit Rule 26.1-3(b), the undersigned certifies that Appellant Abigail Jean Marbut is not aware of any publicly traded company or corporation which has an interest in the outcome of the above-captioned case or appeal.

This 24th day of December 2024.

Respectfully submitted,
**WAYNE B. KENDALL, P.C.**

*s/ Wayne B. Kendall*
WAYNE B. KENDALL
Georgia Bar No.: 414076
wayne@waynebkendallpc.com

155 Bradford Square, Suite B
Fayetteville, GA 30215
(678) 884-6084

**THE REEVES LAW FIRM, LLC**

The Reeves Law Firm, LLC
P.O. Box 544
Experiment, GA 30212
Telephone: (678) 727-6956

*s/ Jeffrey Reeves*
JEFFREY REEVES
Georgia Bar No. 940541
jareeveslaw@gmail.com

*Attorneys for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Abigail Marbut respectfully requests oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS & CORPORATE .......................... i

DISCLOSURE STATEMENT OF APPELLANT ABIGAIL JEAN MARBUT ..... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF CITATIONS .................................................................................. iv

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUES ...........................................................................2

STATEMENT OF THE CASE ...............................................................................3

    Nature of the Case ........................................................................................3

    Course of Proceedings and Dispositions in the Court Below ...............................3

    Statement of the Facts.....................................................................................5

    Statement of the Standard or Scope of Review for Each Contention .................10

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT ....................................................................................................15

    I.    The District Erred in Granting Immunity to Officer Phillips for his Use of Excessive Force Against Appellant ...............................................................15

    II.   Appellees Unlawfully Detained Appellant in the Absence of Any Indication that Appellant was a Danger to Herself or Others and in Violation of Georgia's Mental Health Law ..................................................................355

    III.  The District Court Erred in Dismissing Appellant's Claim that Appellees Failed to Intervene to Prevent the Use of Excessive Force Against Her........477

## TABLE OF CONTENTS (CONT'D)

**Page**

CONCLUSION ..................................................................................................488

CERTIFICATION OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CITATIONS

**Cases**                                                                **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)  ................................................................... 11, 30

*Baker v. Dekalb County, Case No. 1:12-cv-3247-WSD*,
   2014 U.S. Dist. LEXIS 24838 (N.D. Ga. Feb 27, 2014) ..................... 17, 31

*Bell v. Wolfish*,
   441 U.S. 520 (1979)  ..................................................................... 17

*Brower v. County of Inyo*,
   489 U.S. 593 (1989)  ..................................................................... 15

*Brown v. City of Huntsville*,
   608 F.3d 724 (11th Cir. 2010) ...................................................... 15, 17

*Cloaninger v. McDevitt*,
   555 F.3d 324 (4th Cir. 2009) ...................................................... 42, 43

*Crosby v. Monroe County*,
   394 F.3d 1328 (11th Cir. 2004) .................................................... 35, 36

*Durruthy v. Pastor*,
   351 F.3d 1080 (11th Cir. 2003) ........................................................ 36

*Fils v. City of Aventura*,
   647 F.3d 1272 (11th Cir. 2011) .............................. 19, 23, 25, 26, 28

*Gerstein v. Pugh*,
   420 U.S. 103 (1975)  ..................................................................... 36

*Glenn v. State*,
   310 Ga. 11, 849 S.E.2d 409 (2020). ...........................................…….11, 12

*Graham v. Connor*,
   490 U.S. 386 (1989) …………………………………  11, 12, 15, 20, 22, 23, 32

*Grider v. City of Auburn*,
   618 F.3d 1240, 1266-1267 (11th Cir. 2010)  ..................................... 18

*Gundy v. City of Jacksonville*,
   50 F.4th 60 (11th Cir. 2022) .......................................................... 10

## TABLE OF CITATIONS (CONT'D)

**Cases**                                                                **Page(s)**

*Hadley v. Gutierrez*,
  526 F.3d 1324 (11th Cir. 2008) ........................................................ 20

*Helm v. Rainbow City*,
  989 F.2d 1265 (11th Cir. 2021) ........................................................ 16

*Herzog v. Castle Rock Entertainment*,
  193 F.3d 1241 (11th Cir. 1999) ........................................................ 10

*Hickson Corp. v. N. Crossarm Co.*,
  357 F.3d 1256 (11th Cir. 2004) ........................................................ 10

*Horn v. Barron*,
  720 F. Appx. 557 (11th Cir. 2018) ……………………...….22, 32, 33, 34, 35

*Howard v. Hudson*,
  613 F. App'x 866 (11th Cir. 2015) .......................................…… 20

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ........................................................ 36

*Ingram v. Kubik*,
  30 F.4th 1241 (11th Cir. 2022) ........................................................ 28

*Jay v. Hendershott*,
  579 F. App'x 948 (11th Cir. 2014) ................................................... 24

*Lee v. Ferraro*,
  284 F.3d 1188 (11th Cir. 2002) ......................................... 15, 20, 25

*Macuba v. DeBoer*,
  193 F.3d 1316 (11th Cir. 1999) ........................................................47

*May v. City of Nahunta*,
  846 F.3d 1320 (11th Cir. 2017) ........................................................ 35

*Monday v. Oullette*,
  118 F.3d 1099 (6th Cir. 1997) ................................................... 43, 45

## TABLE OF CITATIONS (CONT'D)

**Cases**                                                                              **Page(s)**

*Montoute v. Carr*,
    114 F.3d 181 (11th Cir. 1997) ............................................................. 17

*Newcomb v. Spring Creek Cooler, Inc.*,
    926 F.3d 709 (11th Cir. 2019) ............................................................. 10

*Post v. City of Fort Lauderdale*,
    7 F.3d 1552 (11th Cir. 1993) ............................................................... 18

*Priester v. City of Riviera Beach*,
    208 F.3d 919 (11th Cir. 2000) ............................................................. 47

*Raney v. Vinson Guard Serv.*,
    Inc., 120 F.3d 1192 (11th Cir. 1997) ................................................... 30

*Rivas-Villegas v. Cortesluna*,
    595 U.S. 1 (2021) ................................................................................ 16

*Roberts v. Spielman*,
    643 F.3d 899 (11th Cir. 2011) ............................................................. 36

*Robinson v. Lambert*,
    753 F. App'x 777 (11th Cir. 2018) ...................................................... 19

*Ruiz-Zaragoza v. Kruse*,
    No. 19-cv-255, 2024 U.S. Dist. LEXIS 66998 ................................... 34

*Samarco v. Neumann*,
    44 F. Supp. 2d 1276, 1284-1285 (S.D. Fla. 1999) ............................ 15

*Smith v. Mattox*,
    127 F.3d 1416 (11th Cir. 1997) ........................................................... 19

*Stephens v. DeGiovanni*,
    852 F.3d 1298 (11th Cir. 2017) ........................................................... 19

*Tennessee v. Garner*,
    471 U. S. 1 (1985) .............................................................................. 17

*Terry v. Ohio*,
    392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) ........................ 35

## TABLE OF CITATIONS (CONT'D)

**Cases**                                                          **Page(s)**

*United States v. Jordan*,
    635 F.3d 1181 (11th Cir. 2011) ........................................................ 35

*Velazquez v. City of Hialeah*,
    484 F.3d 1340 (11th Cir. 2007) ........................................................ 47

*Wilkins v. Gaddy*,
    599 U.S. 34 (2010) ........................................................................... 34

*Williams v. Corr. Officer Radford*,
    64 F.4th 1185 (11th Cir. 2023) ........................................................ 48

**Statutes**

28 U.S.C. §§ 1291 ...................................................................................... 1

28 U.S.C. §§ 1331, 1343(a)(3) and (4) .................................................... 1

42 U.S.C. § 1983 ................................................................................... 1, 3

42 U.S.C. §§ 37-3-41 ............................................................................. 46

Ga. Code Ann. § 37-3-41 ....................................................................... 46

Ga. Code Ann. § 37-3-42 ....................................................................... 46

**Rules**

Fed. R. Civ. P. 41 ..................................................................................... 4

Fed. R. Civ. P. 56 .............................................................................. 10, 31

## STATEMENT OF JURISDICTION

Jurisdiction for this action arising under 42 U.S.C. § 1983 and Georgia state law was proper in the United States District Court for the Northern District of Georgia under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a) because Appellant's claims arise under the Constitution and laws of the United States and the state law claims are supplemental to the federal claims. The district court entered final judgment against petitioner as to all claims on September 30, 2024. On October 14, 2024, Appellant filed a timely notice of appeal. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1291 and 1294(1).

## STATEMENT OF THE ISSUES

I.      Whether the District Court erred in granting Defendant-Appellees' motion for summary judgment and dismissing Plaintiff-Appellant's claim of excessive force.

II.     Whether the District Court erred in granting Defendant-Appellees' motions for summary judgment and dismissing Plaintiff-Appellant's claim of unlawful detention.

III.    Whether the District Court erred in granting Defendant-Appellees' motions for summary judgment and dismissing Plaintiff-Appellant's claim of failure to intervene.

## STATEMENT OF THE CASE

### Nature of the Case

Appellant Abigail Jean Marbut seeks damages under 42 U.S.C. § 1983 against police officer Appellees Matthew Phillips, Joshua Cash, Kirby Collier, and Justin Pena for (i) excessive force, (ii) wrongful seizure, and (iii) failure to intervene in violation of her Fourth Amendment rights. Appellant suffered significant – and permanent – physical harm as a result of Appellees' actions. Appellant also seeks recovery of damages for violations of Georgia state law, including false arrest, false imprisonment, assault, battery, and aggravated battery.

### Course of Proceedings and Dispositions in the Court Below

Appellant commenced this action by filing her complaint against Appellees, as well as Sergeant Michael David Lecroy, on February 23, 2022. (Dkt. No. 1.) Thereafter, on March 30, 2022, Appellees and Sgt. Lecroy filed their answer. (Dkt. No. 7.)

On November 22, 2023, Appellant filed a motion for summary judgment. (Dkt. No. 79.) On November 27, 2023, Appellees and Sgt. Lecroy filed a joint motion for summary judgment. On December 13, 2023, Appellees and Sgt. Lecroy filed a response opposing Appellant's motion for summary judgment. (Dkt. No. 83.) On January 8, 2024, Appellant filed a response opposing Appellee's and Sgt. Lecroy's joint motion for summary judgment. (Dkt. No. 90.) On that same date,

Appellant filed a response to Appellees' and Sgt. Lecroy's joint statement of undisputed facts. (Dkt. No. 91.)

On January 12, 2024, Appellant stipulated to the dismissal of Sgt. Lecroy from the action. (Dkt. No. 92.) On January 17, 2024, Appellant filed a stipulation to the dismissal of Sgt. Lecroy from the action pursuant to Fed. R. Civ. P. 41(a)(1)(ii). (Dkt. No. 93.)

On January 22, 2024, Officers Cash, Kirby, and Collier filed a reply brief in support of the joint motion for summary judgment. (Dkt. No. 95.) On that same date, Officer Phillips filed a reply brief in support of the joint motion for summary judgment. (Dkt. No. 96.)

On September 30, 2024, the District Court filed an order denying Appellant's motion for summary judgment and granting Appellees' joint motion for summary judgment. (Dkt. No. 110.) The District Court found that Appellees were entitled to qualified immunity and dismissed Appellant's federal civil rights claims. The District Court also dismissed Appellant's state law claims, concluding that the evidence failed to raise an inference of malice or intent to cause injury. On that same day, the clerk entered judgment. (Dkt. No. 111.) Appellant appealed the matter to this Court on October 14, 2024. (Dkt. No. 112.)

**Statement of the Facts**

On May 20, 2021, Appellant went shopping with her mother Renee Marbut, her mother's boyfriend, and her two children. (Dkt. No. 81-2 at p.1.) Renee drove in a black Jeep to a Dollar General store, where Appellant shopped for groceries. (Dkt. No. 81-2 at p. 1.) Thereafter, Renee drove to the home of her sister-in-law, Lori Chromi, where Appellant was residing, at 3138 Old Jackson Rd, Locust Grove, Georgia 30248. (Dkt. No. 81-2 at p. 1.) Upon arriving at the house, Renee observed Appellant asleep in the back seat. (Dkt. No. 81-2 at p. 1.) After trying unsuccessfully to rouse Appellant, Renee grew concerned and called 911. (Dkt. No. 81-2 at p. 1.) Renee's reaction stemmed from her belief that Appellant might have ingested drugs, specifically gamma hydroxybutyric, commonly referred to as GHB. (Renee Marbut Dep. at 48:14-21.) Renee had not seen Appellant take any drugs on that day but believed that Appellant had used drugs previously. (Renee Marbut Dep. at 48:14-21.)

Approximately 15 minutes later, at around 3:55 p.m. emergency medical personnel, including emergency medical technicians ("EMTs") and paramedics, police officers, and firefighters arrived. (Dkt. No. 81-1 at p. 2.) Among those on the scene were police officers Phillips, Cash, Collier, and Pena, advanced emergency medical technician ("AMT") Amanda Pitts, and paramedic Adam Bedford. As the authorities arrived, Appellant awoke and, after several minutes, exited her mother's

vehicle, which had pulled into the driveway toward the rear of the house. (Dkt. No. 81-2 at p. 1.) Appellant was questioned while she sat in the Jeep and then when she got out of the car. (Dkt. No. 81-1 at p. 2.)

After getting out of the car, Appellant said that she did not want to go to the hospital. (Dkt. No. 81-1 at p. 2; Dkt. No. 82 (Body-worn Camera Footage taken on May 20, 2021 by Officer Phillips ("Phillips BWC") at 11:44.) Medical personnel and police then addressed Appellant and requested that she accompany them to the hospital where she could be evaluated. (Dkt No. 82, Phillips BWC at 13:24.) Officer Pena questioned Appellant as she stood between two cars in the driveway, one gray the other red. (Dkt. No. 82, Phillips BWC at 13:37; Dkt. No. 82 (Body-worn Camera Footage taken on May 20, 2021 by Officer Collier ("Collier BWC") at 0:57.) Appellant informed them that she did not want to go to the hospital and that she was fine. (Dkt. No. 82, Phillips BWC at 13:50.) Officer Pena tried another tack and laid out an ultimatum for Appellant:

> *"Pretty much it's either you voluntarily go or we'll take you. That's where we're at. I'm not going to ... we're not going to play around. So, what's your choice?"*

(Phillips BWC at 13:24.) When Appellant asked what the problem is, AMT Pitts said:

> *"Your problem is currently you've got about 10 seconds to make up your mind to go with us or going with them. Because we're not going to stand here all day and argue with you. Do you understand me? So, pick one."*

6

(Phillips BWC at 13:59.) Officer Pena then told Appellant: *"Listen, you don't have a choice"* to which Appellant responded by saying that she did not want to go to the hospital and insisted that *"there is nothing wrong with me. There's nothing wrong with me."* (Dkt, No. 82, Phillips BWC at 14:14, 14:20.) When Appellant began to cry, Officer Pena then told Appellant that *"You're not in trouble, ok? We're trying to get you the help that you need."* (Dkt. No. 82, Phillips BWC at 14:33.)

As Officer Collier arrived, AMT Pitts can be heard saying to a firefighter:

> *"She can answer her name, her date of birth, where she's at. She has all the correct answers. Technically, I mean, she's sound of mind."*

(Dkt. No. 82, Collier BWC at 1:05). AMT Pitts added:

> *"We would like to take her so she can be evaluated but if she can tell us who she is and answer all of our questions properly then technically we are not allowed to take her."*

(Dkt. No. 82, Phillips BWC at 15:20). Paramedic Bedford later testified that he did not have the authority to involuntarily take Appellant to the hospital against her will. (Dkt. No. 69-1, at 16:20-25, 17:1-2.).

Officer Collier suggested to AMT Pitts that she call a doctor: *"Call the Doc, he's the boss. Put it on him. It's all you can do."* (Collier BWC at 1:17, 1:24.) Officer Collier then asked AMT Pitts *"what'd she do illegally?"* AMT Pitts responded: *"nothing."* (Collier BWC at 1:43.)

7

It was in the moments after the above exchanges that Appellant informed Officer Pena that she needed to use the restroom and turned to go to the house. (Dkt. No. 82, Phillips BWC at 17:53; Dkt. No. 82, Collier BWC at 2:47.) Officer Phillips, who had witnessed the discussion between Appellant, Officer Pena, and AMT Pitts, had stationed himself between two cars in the driveway with his hand resting on the red car. (Dkt. No. 82, Collier BWC at 2:38.) After turning away from Officer Pena, Appellant headed toward Officer Phillips and attempted to go between him and a red car parked in the driveway. (Phillips BWC at 17:53; Dkt. No. 82, Collier BWC at 2:47.) As she did so, she said: *"Excuse me, I need to go to the restroom."* (Phillips BWC at 17:53; Dkt. No. 82, Collier BWC at 2:47.)

As she approached Officer Phillips, he reached out his right arm toward Appellant and said: "*Hold on, hold on, Abi."* (Dkt. No. 82, Phillips BWC at 17:54.) In response, Appellant repeated: *"Excuse me, I have to go to the restroom."* (Dkt. No. 82, Phillips BWC at 17:55; Dkt. No. 82, Collier BWC at 2:49.) But before she had finished uttering that statement, Officer Phillips shouted: *"Don't! Do not put your hands on me!"* (Dkt. No. 82, Phillips BWC at 17:55; Dkt. No. 82, Collier BWC at 2:49.) The command startled Appellant, who immediately stopped heading for the house, stepped back against the red car, and brought her arms toward her body and up to protect herself. (Dkt. No. 82, Phillips BWC at 17:55.) Officer Phillips then spun her to her left and against the red car and, within four to five seconds had

8

grabbed her right arm and wrenched it behind her back. (Dkt. No. 82, Phillips BWC at 17:57.)

Officers Cash and Collins quickly joined to assist Officer Phillips as Appellant can be heard screaming in pain. (Dkt. No. 82, Phillips BWC at 17:58.) Officer Phillips continued to twist Appellant's right arm behind her back, while jamming her hand upwards toward her shoulder blades, in what Officer Pena later described in his police report as a *"Kimora (sic) arm lock",[1]* only relenting when he realized that he had broken her arm. (Dkt. No. 82, Phillips BWC at 18:20.) As Officers Cash and Collins attempted to handcuff Appellant, Officer Phillips held up Appellant's arm, which flopped downward, the bone no longer supporting it. (Dkt. No. 82, Phillips BWC at 18:50; Dkt. No. 82, Collier BWC at 4:28.) Appellant's left arm was eventually handcuffed to her belt loop and she was led, crying and in intense pain, to a gurney. (Dkt. No. 82, Collier BWC at 3:56, 6:51.) She was then sedated and taken to Henry County Piedmont Hospital by ambulance. (Dkt. No.79-4.)

At the hospital, Appellant was diagnosed with an oblique fracture of the right mid-distal humerus. (Dkt. No. 79-4.) Because of improper healing and complications, Appellant later had surgery on her right arm (Dkt. No. 70-5 at p. 2.) She was diagnosed with nerve damage and may face future surgery. (Dkt. No. 70-5 at p. 2.) Appellant was later treated and evaluated by Dr. Vinson Smith who

---

[1]    See Henry County police report, at p. 2 of 9, (Dkt. No. 71-3.)

determined that she had sustained radial nerve damage and that her injuries, including loss of sensation in her right arm, weakness in her right arm, and a loss of motion at the elbow and shoulder, were permanent. (Dkt. No. 70-1 at pp. 22:8-23:12.) Appellant requires physical therapy and, owing to her being unemployed and without medical insurance, faces mounting medical bills. (Dkt. No.70-5 at p. 2.)

### Statement of the Standard or Scope of Review for Each Contention

This Court reviews *de novo* a district court's grant of summary judgment. *See, e.g.,* 50 F.4th 60, 70 (11th Cir. 2022); *Newcomb v. Spring Creek Cooler, Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). Summary judgment is not properly granted unless the movant below *"shows that there is no genuine dispute as to any material fact."* Fed. R. Civ. P. 56(a). Assertions that a fact is genuinely disputed must cite to *"particular parts of materials in the record"* to support those assertions. Fed. R. Civ. P. 56(c)(1). "*An issue of fact is material if, under the applicable substantive law, it might affect the outcome of the case.*" *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004) (internal quotation marks omitted). "*If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.*" *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir. 1999). As *"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,"* they may not be relied upon in granting summary judgment. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Further, "*the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in their favor." Id.*

### SUMMARY OF THE ARGUMENT

The District Court erred in granting summary judgment to Appellees and dismissing Appellant's excessive force claim. Although the court found that Appellant had committed no crime, was not subject to arrest, was seized by Appellees, and was subjected to forceful detention resulting in severe physical harm, it nonetheless granted the police officers qualified immunity, thereby barring Appellant's claim. In so doing, the court below misapplied the factors outlined in *Graham v. Connor*, 490 U.S. 386, 394 (1989), and misapplied this Court's precedent. Specifically, notwithstanding the District Court's acknowledgement that Officer Phillips *"grabbed [Appellant] first and that she made no threatening moves towards him,"* it illogically concluded that the officer's use of force was a permissible response to what it deemed Appellant's *"struggling"* and *"resisting."* (Dkt., No. 110 at p. 25.)[2] A close examination of the body-worn camera evidence, however, demonstrates that at the time force was applied, Appellant was neither

---

[2]      Under Georgia law as determined by the Georgia Supreme Court, a citizen has a common law right to resist an unlawful arrest and to escape from it. *Glenn v. State*, 310 Ga. 11, 849 S.E.2d 409 (2020). Consequently, given the findings by the District Court that Marbut had committed no crime; was not a threat to the officers on the scene; that Phillips grabbed her first without her having made any threatening moves toward him, then it does not follow that **any** use of force was warranted.

struggling nor resisting. She was, in fact, stepping back and away from Officer Phillips after he shouted a command at her not to touch him. As a result, a proper application of the *Graham* factors demonstrates that Appellees lacked a legal basis to use any force, much less force sufficient to snap Appellant's upper arm bone. What began with Appellant excusing herself so that she could use the restroom became, within a matter of seconds, a textbook example of unconstitutional excessive force.

The District Court erroneously analyzed the risk of flight factor to favor Phillips' use of force. (Dkt. No. 110 at p. 25.) In light of the fact that the District Court found that there was no crime committed, nor suspected of having been committed, then under Georgia law Marbut was entitled to attempt to escape from an unlawful detention. *Glenn v. State*, 310 Ga. 11, 849 S.E.2d 409 (2020).[3] It therefore does not follow that *"[t]he 'risk of flight' factor weighs strongly in favor of Defendant Phillips"*, where Marbut had a common law right to resist and to escape from an unlawful detention. *Id.* The District Court also erred in dismissing Appellant's claim of unlawful seizure in violation of the Fourth Amendment. Although the court deemed Appellant's detention a justifiable *"mental-health*

---

[3]      According to *Glenn v. State*: *"[g]enerally, under the common law, a person cannot be punished for fleeing from or physically resisting an unlawful arrest or escaping from an unlawful detention, so long as the person uses no more force than is necessary to achieve such purpose."* Citing *United States v. Di Re*, 332 U.S. 581, 594, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

*seizure,"* it ignored, and failed to mention or to account for the statements of emergency medical personnel who informed the police that they had no mental health grounds to take Appellant to the hospital. (Dkt. No. 110 at pp. 19, 20.) Unlike the factual scenarios in other decisions of this Court, Appellant here displayed no indication that she was a threat to herself or anyone else.[4]

Additionally, the police and medical first responders failed to follow the protocol set forth under Georgia's mental health law, which requires a physician's approval to seize and transport an individual suspected of suffering from mental illness if the police officer has not observed the person committing a penal offense. O.C.G.A. § 37-3-42. Georgia law provides that even where a peace officer has probable cause to believe an individual is a mentally ill person, the peace officer must still consult a physician to obtain approval to detain the person. O.C.G.A. § 37-3-42(a)(2).  In fact, one of the Appellees told an emergency medical crew member: *"Call the Doc, he's the boss. Put it on him. It's all you can do."* (Dkt. No. 82, Collier BWC at 1:17.) No doctor was ever summoned, nor contacted, to authorize an involuntary mental health seizure. The District Court errantly characterized Marbut's seizure as a justifiable *"mental health seizure"* where no physician was ever contacted for approval to execute the seizure.

---

[4]     As stated above, the District Court specifically found that Marbut was no threat to Phillips before he first grabbed her.  (Dkt., No. 110 at p. 25.)

Finally, the District Court erred in in granting summary judgment to Appellees and dismissing Appellant's failure to intervene claim. Because Appellees used excessive force against Appellant, the failure to intervene claim remains viable and should be remanded to the court below.

**ARGUMENT**

I.    **The District Erred in Granting Immunity to Officer Phillips for his Use of Excessive Force Against Appellant**

A claim of excessive force arises under the Fourth Amendment, which guarantees the freedom from unreasonable searches and seizures. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). *"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). To establish such a claim, a plaintiff must show that a seizure occurred and *"that excessive force was used to effect the seizure." Samarco v. Neumann*, 44 F. Supp. 2d 1276, 1284-1285 (S.D. Fla. 1999) (citing *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (a seizure occurs *"when there is a governmental termination of freedom of movement through means intentionally applied"*). It should be noted that although many excessive force cases arise in the context of an arrest, governmental actors, including police officers, may be liable for actions they take in the absence of an arrest, such as when they seize, detain, or otherwise restrict the movements of an individual where no arrest is anticipated or made. *Graham*, 490 U.S. at 395 (discussing claims of excessive force *"in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen"*).

To the extent a defendant to an excessive force claim is acting in the scope of their authority and in the course of their official duties, they may avail themselves of qualified immunity. *See*, *e.g.*, *Vinyard v. Wilson*, 311 F.3d1340, 1346 (11th Cir. 2002). Qualified immunity, however, is unavailable where the defendant (i) violates a federal right and (ii) that right was *"clearly established"* at the time of the alleged violation. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (*"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*).

As is well-settled, a defendant's use of force is examined under a "reasonableness" standard first set forth in *Graham*, 490 U.S. at 396. There, the Court instructed judges to assess the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of governmental officers or others, and whether they were actively resisting arrest or attempting to evade arrest by flight. *See id.* The Eleventh Circuit has identified additional factors in determining whether excessive force was used against an individual: *"the need for application of force, the relationship between the need and amount of force used, and the extent of injury inflicted by the arresting officer." Helm v. Rainbow City*, 989 F.2d 1265, 1273 (11th Cir. 2021). *See also Lee*, 284 F.3d at 1198 (United States Supreme Court guidance *"dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is*

measured by the severity of the crime, the danger to the officer, and the risk of flight"). In applying these factors, a court must determine whether the governmental actor's *"actions are objectively reasonable in light of the facts confronting [him or her], regardless of the officer's underlying intent or motivation". Montoute v. Carr*, 114 F.3d 181, 183 (11th Cir. 1997) (citing *Graham*, 490 U.S. at 397).

Distinguishing reasonable from unreasonable conduct under the Fourth Amendment requires a highly fact-centric inquiry. *See Graham*, 490 U.S. at 396. (reasonableness is *"'not capable of precise definition of mechanical application,'"* thereby making "its proper application" dependent on *"careful attention to the facts and circumstances of each particular case"*) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)); *Tennessee* v. *Garner,* 471 U. S. 1, 8-9 (1985) (the question is *"whether the totality of the circumstances justified a particular sort of search or seizure"*).

To be sure, the Fourth Amendment permits officers to use *"some degree of physical coercion"* in performing an arrest or other permitted detention. *Brown*, 608 F.3d at 737-738. However, the force used must be deemed reasonable, a determination dependent on *"a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id.* Reasonableness further devolves upon an assessment of whether *"an objectively reasonable officer in the same situation could have believed the use of force was not excessive." Id.* at 738. *See also Lee*, 284 F.3d

17

at 1197 (*"to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand"*) (internal quotation marks omitted); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (*"Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*) (internal quotation marks omitted), *modified*, 14 F.3d 583 (11th Cir. 1994).

Determining whether a constitutional right was clearly established, as necessitated under the analytic rubric for applying qualified immunity, similarly requires viewing the facts from the vantage of a reasonable officer. *Saucier*, 533 U.S. at 201, 202 (inquiry *"must be undertaken in light of the specific context of the case, not as a broad general proposition"*); *Grider v. City of Auburn*, 618 F.3d 1240, 1266-1267 (11th Cir. 2010) (*"In determining whether a constitutional right was clearly established at the time of violation, the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."*). To the extent that the conduct at issue is so egregious as to violate the Fourth Amendment on its face, it will be deemed to have violated a clearly established right. *See Vinyard* at 1351. In other instances, the language of a statute or prior judicial decisions with similar factual scenarios may serve as sufficient notice to officers of a clearly established right. *Id.* at 1350-1351.

Although the potential permutations of excessive force are as varied as the course of human interactions, certain factual scenarios have given way to broad guidelines in the adjudication of civil rights cases. For instance, this Court has previously held that *"unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." Fils v. City of Aventura,* 647 F.3d 1272, 1289 (11th Cir. 2011). The Court similarly found that an individual who had previously been violent toward police officers was nonetheless deprived of his right to be free from excessive force when the officers broke his arm following his surrender. *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997). And in *Baker v. Dekalb County*, Case No. 1:12-cv-3247-WSD, 2014 U.S. Dist. LEXIS 24838 (N.D. Ga. Feb 27, 2014), the court found that it *"cannot conclude, as a matter of law, that an objectively reasonable police officer would have believed that force sufficient to break Plaintiff's arm was not excessive." See also Robinson v. Lambert*, 753 F. App'x 777 (11th Cir. 2018) (qualified immunity denied where Plaintiff's arm was broken after he put officer on notice of pre-existing condition); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1308 (11th Cir. 2017) (defendant officer not entitled to qualified immunity from excessive force claim where he *"unexpectedly slapped"* a listening device from a plaintiff's ear and subsequently punched him in the chest *"for no reason"*).

The absence of a legitimate law enforcement justification for using force has similarly been an indicator that force against an individual is violative of the Fourth Amendment. In *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002), for example, the defendant police officer was not entitled to qualified immunity against a claim of excessive force where the Court could *"discern no reason, let alone any legitimate law enforcement need"* for the force used against the plaintiff. In *Howard v. Hudson*, 613 F. App'x 866, 869 (11th Cir. 2015), this Court affirmed the denial of a grant of qualified immunity to a defendant officer who applied force prior to ever stating that the plaintiff was under arrest. *See also Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (*"gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force"*).

In its analysis of Appellant's excessive force claim here, the District Court found that Appellees were entitled to qualified immunity and dismissed Appellant's excessive force claim. (Dkt. No. 110 at p. 23.) As a threshold matter, the District Court found that Officer Phillips was acting within the scope of his authority as a law officer and was thus immune from suit unless he violated a clearly established right when he used force to detain Appellant. (Dkt. No. 110 at p. 23.) The District Court then proceeded to address the factors set forth in *Graham* and Eleventh Circuit precedent, and made the following findings:

- <u>Severity of the crime</u> As no crime was committed, this factor was not applicable. (Dkt. No. 110 at p. 24.)

- <u>Danger to the officer</u> This factor weighed in Appellant's favor as she posed no danger to Officer Phillips or, presumably to any other officer. The District Court also noted that viewing the evidence in Appellant's favor, Officer Phillips *"grabbed her first and then physically restrained her without her having made any threatening moves towards him."* (Dkt. No. 110 at p. 24-25.)

- <u>Risk of flight</u> The District Court found that this factor *"weighs strongly in favor of [Officer] Phillips"* because Appellant *"was trying to leave the driveway and go into the house when the altercation occurred."* (Dkt. No. 110 at p. 25.) The District Court concluded that there was *"no doubt"* that Appellant was a flight risk *"when she had the altercation with [Officer] Phillips."* (Dkt. No. 110 at p. 25.)

- <u>Need for application of force</u> The District Court found that this factor weighed in favor of Officer Phillips as Appellant, *"as all parties admit, [] was beginning to turn away and struggle as [Officer] Phillips grabbed her."* (Dkt. No. 110 at p. 25.) The District Court also reasoned that *"some force was necessary to restrain"* Appellant because she *"actively resisted [Officer] Phillips's attempts to restrain her."* (Dkt. No. 110 at p. 25.)

- <u>Relationship between the need and amount of force used</u> The District Court found that this factor *"strongly supports [Officer] Phillips"* because the

*"undisputed facts indicate"* that Appellant struggled with [Officer] Phillips when he grabbed her." (Dkt. No. 110 at p. 25.)

• <u>Extent of injury</u> The District Court found that this factor favors Appellant, who suffered a *"serious"* injury that *"has significantly impacted her quality of life since the incident."* (Dkt. No. 110 at p. 26.)

After its factor-by-factor analysis, the District Court concluded that Officer Phillips's use of force was reasonable. (Dkt. No. 110 at p. 26.) It further stated that this conclusion *"is in line with many Eleventh Circuit cases that have found that similar uses of force were reasonable during an individual's detention."* (Dkt. No. 110, at 26 (citing *Horn v. Barron*, 720 App'x 557 (11th Cir. 2018).)

The District Court's decision cannot withstand review as it misapplied the *Graham* factors and this Court's precedent as well as intruding on the province of the factfinder by ignoring or glossing over disputed issues of fact.

First, as the District Court acknowledged, Appellant posed no danger to Officer Phillips. This factor is significant because it colored the entire encounter between Appellant and Officer Phillips, which resulted in his violently fracturing Appellant's humerus, or upper arm bone. The court's finding that Officer Phillips *"grabbed [Appellant] first and then physically restrained her without her having made any threatening moves towards him"* establishes that the confrontation and subsequent escalation was not of Appellant's making. (Dkt. No. 110 at p. 24-25.)

*See Fils v. City of Aventura,* 647 F.3d at 1289 (suspect who took step back when ordered by officer and did not disobey any commands posed no danger to officer). Appellant's non-threatening conduct could not have reasonably provoked Officer Phillips's actions which culminated with Appellant being wheeled, under sedation, on a gurney to an ambulance with a broken arm. The fact that Appellant was of no threat to Officer Phillips is crucial in reviewing the other *Graham* factors.

Second, the risk of flight factor does not weigh in favor of Officer Phillips – and certainly does not weigh *"strongly"* in his favor, as the District Court found. (Dkt. No. 110 at p. 25.) As a preliminary matter, risk of flight typically is a concern for officers preparing to make an arrest or confronting a suspect who has the means to make an escape, such as in a vehicle. *See*, *e.g.*, *Graham*, 490 U.S. at 396 ("attempting to evade arrest by flight"). In contrast, Appellant's actions here hardly merit the label of flight. She twice clearly expressed the need to use the restroom and began walking toward the house where she lived with her aunt. She did not attempt to get in a car and drive away or to run toward the road or otherwise take action that would have required the police to chase her, raising the possibility that she would not be found. Nonetheless, the District Court credited Officer Phillips's statement that *"he was concerned that [Appellant] would go into the house and not come out, thereby obstructing medics' ability to evaluate and treat her"* in determining that Appellant was a flight risk. (Dkt. No. 110 at p. 6.)

23

Respectfully, the court's reasoning – set forth in a bare two sentences – is strained. (Dkt. No. 110 at p. 25.) Compare, for example, Appellant's actions with those described in *Jay v. Hendershott*, 579 F. App'x 948, 952 (11th Cir. 2014), where the plaintiff led police officers on a lengthy, albeit slow, car chase during which he failed to obey the officers' repeated commands to stop and made no attempt to cede to the officers' authority. Upon arriving at his home, the plaintiff got out of his car and *"single-mindedly continued to approach his open garage over officers' numerous commands that he stop." Id.* at 952-953. Significantly, "[i]n light of [the plaintiff's] lengthy period of noncompliance, his unwavering resolve to enter the garage, and his unusual behavior, officers had no way of knowing [the plaintiff's] purpose in going into the garage, whether weapons awaited him, or whether [the plaintiff] intended to enter the house and possibly take hostages." *Id.* Upon those facts, one might reasonably conclude that force would be required to prevent the plaintiff's flight. But that is not what took place here. As discussed at length below, Officer Phillips made a single shouted command to Appellant not to touch him as she endeavored to squeeze between him and a parked car so that she could go to the restroom. And upon that command, Appellant immediately backed away and began to raise her arms. Trapped between Officer Phillips and a parked car, there was no flight to be had. *See also Fils v. City of Aventura*, 647 F.3d at 1289 (denying qualified

immunity to defendant officer as suspect was not attempting to escape after obeying verbal command).

Moreover, Appellant was not under arrest and, as all personnel who were present have acknowledged, Appellant had done nothing remotely criminal. *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (no qualified immunity where the Court could *"discern no reason, let alone any legitimate law enforcement need"* for the force used against the plaintiff"). Officer Pena himself said to Appellant: *"you're not in trouble, ok?"* (Dkt. No. 82, Phillips BWC at 14:33.)

It also should not escape notice that for nearly ten minutes Officer Phillips observed Appellant responding to the questions of fellow police officers and emergency medical personnel, first in the back seat of her mother's car and thereafter in the driveway. As evident from Officer Phillips's body-worn camera footage, Appellant was conscious, upright, and moving around. (Dkt. No. 82, Phillips BWC at 11:15.) She told officers that she had not done anything wrong and that she did not want to go to the hospital. Those observations belie Officer Phillips's later statement that he seized Appellant because, according to the District Court, he *"believed that if [Appellant] went in and passed out, medics would have to take more time to get to her and provide treatment."* (Dkt. No. 110 at p. 6.) After emerging from the rear of her mother's car, Appellant showed zero signs of passing out. Although she was upset at being surrounded by police officers and medical

personnel who were insisting that she go with them to the hospital, she was also conversant, mobile and exhibited no threat to them or to herself. Officer Phillips's ultimate use of force – against an individual who he was purportedly concerned might pass out – further undermines his after-the-fact rationalization for why he needed to stop her so urgently from fleeing to the restroom. At bottom, Appellant did not pose a risk of flight.

Third, the District Court incorrectly analyzed the "need for application for force" factor. In finding that Appellant began to *"turn away and struggle as [Officer] Phillips grabbed her,"* the court misapprehended the sequence of events, to say nothing of making improper inferences about disputed facts. (Dkt. No. 110 at p. 25.) As Appellant tried to get by Officer Phillips to go into the house – saying *"excuse me, I need to use the restroom"* as she did so – Officer Phillips shouted *"Don't! Do not put your hands on me!"* (Dkt. No. 82, Phillips BWC at 17:55.) In response to his raised voice, Appellant immediately withdrew her arms to her body and upward and stepped away, although her ability to back up further was thwarted by one of the cars parked in the driveway. *See Fils*, 647 F.3d at 1289 (no need for force against a suspect who *"put his hands in the air and took a step away from"* the defendant officer who then tased him) (emphasis in original). Officer Phillips allowed no time to pass from when he yelled at Appellant to when he grabbed her and her compliance not to touch him had no effect on his immediate use of force.

The undersigned commends the Court to review Officer Phillips's own body-worn camera footage, perhaps at half speed, and take a good long look at Appellant's face, body posture, and arms in the immediate aftermath of Officer Phillips shouting at her. Her face was a mask of fright, not aggression. Her body was recoiling from Officer Phillips – not toward him and certainly not, as the District Court concedes, threateningly. Her arms were being withdrawn toward her torso and upwards, an attempt at self-preservation and to get away from the source of verbal aggression aimed at her. Nothing about her aspect, thus, invites the conclusion that force was needed, either to subdue Appellant or protect Officer Phillips. As a result, it simply cannot be said that Appellant *"struggled"* with Officer Phillips before he applied force – swift, violent, and excessive force. Indeed, the District Court had already determined that Officer Phillips *"grabbed [Appellant] first and then physically restrained her without her having made any threatening moves towards him"* (Dkt. No. 110 at p. 25). The court had also already found that Officer Phillips was not in danger and had no reason to fear for his safety. (Dkt. No. 110 at pp. 24-25.) That being the case, it is fair to ask how an unarmed woman's fearful retreat from a policeman's shouted command is characterized as *"struggling"*? *See Howard*, 613 F. App'x at 869 (denying qualified immunity to officer who manhandled suspect who had not been told she was under arrest, deeming that any *"struggle"* by the suspect was done *"arguably to avoid the unlawful force unleashed on her,"* and

finding that a *"reasonable jury could find that [the officer's] use of force was excessive and violated the Fourth Amendment"*). Given that the reasonableness of a police officer's use of force is measured from the perspective of a reasonable officer on the scene (Dot. No. 110 at pp. 23-24), the use of any force here was patently unreasonable. *See, e.g., Ingram v. Kubik,* 30 F.4th 1241, 1250 (11th Cir. 2022) (use of force found unconstitutional where *"there is no indication that [the plaintiff] made any threatening moves toward the police"*).

The court also incorrectly determined that force was justified because Appellant *"actively resisted [Officer] Phillips's attempts to restrain her."* (Dkt. No. 110 at p. 25.) Citing precedent, the court noted that the right to make a seizure necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. (Dkt. No. 110 at p. 25 (quoting *Graham*, 490 U.S. at 396).) But as discussed above, the District Court found that it was Officer Phillips who first grasped Appellant, who had made no *"threatening moves towards him."* (Dkt. No. 110 at p. 25.) *See also Fils*, 647 F.3d at 1289 (suspect ultimately charged with resisting arrest nonetheless did not ignore any verbal instructions). Review of the body-worn camera footage shows that the amount of time that elapsed between when Officer Phillips first reached for Appellant and when he wrenched her arm up and behind her back was fleeting, approximately four to five seconds. (Dot. No. 82, Phillips BWC at 17:54.) Objectively, it cannot be said that Appellant offered any

resistance before or during that span. Instead, the footage shows Appellant being spun around by Officer Phillips who, with speed and strength, deployed the time-tested policeman's maneuver of twisting a suspect's arm behind their back. To the extent Appellant resisted – if she can be said to have resisted at all – it came only after Appellant's arm had been pinioned painfully behind her back and was likely already fractured, *i.e.*, after force had already been applied. *See Howard*, 613 Fed. Appx. at 869 (finding that any *"struggle"* by the suspect was done *"arguably to avoid the unlawful force unleashed on her"*). Appellant was, it appears, too stunned and frightened in those crucial seconds to have done much of anything.

Moreover, resistance, as it is commonly understood, is an intentional act resulting from deliberation and not stemming from a person's kneejerk, physical reaction to pain. Having an officer grab one's arm and twist it behind one's back with sufficient vigor to cleanly break the humerus bone, for instance, can be expected to provoke an instinctive and instantaneous response as one seeks relief from pain.[5] That would appear to be distinct from an act of resistance or defiance. If it were otherwise, anyone who writhes in pain – squirming under the weight of officer kneeling on their back, say, or gasping for air after being placed in a headlock –

---

[5]     Aside from a person's leg bones, the humerus is the longest bone in the body, typically measuring about a foot long and approximately three-quarters of an inch thick. *See*, *e.g.*, https://pubmed.ncbi.nlm.nih.gov/11905558/#:~:text=Abstract,the%20development%20of%20medical%20devices.

would be deemed to be resisting and would lose the benefit of the *"need for application of force"* factor under *Graham's* reasonableness analysis. Indeed, that factor would, as a result, virtually always weigh in favor of the officer where sufficient force is applied to cause pain, creating a circumstance equivalent to *"heads I win, tails you lose."* The law, however, should not countenance such a result. The District Court, thus, erred not only in characterizing Appellant's desperate attempt to relieve the pain in her broken arm as resistance, but then using her instinctive reaction to having her arm violently wrenched as the basis for justifying the use of force in the first place. As a result, the need for force factor supports Appellant – not Officer Phillips.

It also must be pointed out that aside from its misinterpretation of events and misapplication of the law, the District Court unacceptably tramped upon the factfinder's realm. *See, e.g., Anderson,* 477 U.S. 242. As addressed above, Appellant's supposed *"struggle"* and *"resistance"* are not, as the court would have it, undisputed. And their materiality is obvious; after all, if a jury were to evaluate the evidence and determine that Appellant neither struggled nor resisted, it could rule in Appellant's favor that there was no need for any force, much less the amount of force employed by Officer Phillips. *See*, *e.g.*, *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997). The District Court's mischaracterization of

what took place also amounted to an improper weighing of, and drawing inferences from, the evidence.

Fourth, the District Court erred in determining that the *"relationship between the need and amount of force used"* factor weighs in Officer Phillips's favor. As discussed above, the court's characterization that Appellant's conduct constituted resistance and struggling is contradicted by the body-worn camera footage, thereby undermining the notion that Appellant's conduct somehow justified Officer Phillips's use of force. It necessarily follows that if Officer Phillips acted unreasonably in grabbing at Appellant and wrenching her arm behind her back, he also acted unreasonably when he used force sufficient to break Appellant's humerus. *See Baker v. Dekalb County*, 1:12-cv-3247-WSD (N.D. Ga. Feb 27, 2014) (finding that it could not be concluded, *"as a matter of law, that an objectively reasonable police officer would have believed that force sufficient to break Plaintiff's arm was not excessive"*).

But more fundamentally, the evidence presents genuine issues of fact for the jury, and not the judge, to decide, i.e., whether the officer's use of force was proportional to the circumstances and, thus, sanctioned. Although the District Court blithely declared that the facts of Appellant's conduct are uncontested (Dot. No. 110 at p. 25), they remain very much in dispute, thereby precluding a grant of summary judgment. Fed. R. Civ. P. 56(a).

Fifth, as the District Court conceded, the *"extent of injury"* factor tilts decidedly in Appellant's favor. (Dkt. No. 110 at p. 26.) Not only was her arm bone violently broken, but complications following surgery have left her with debilitating nerve damage.

Beyond the above errors in applying the *Graham* factors, the District Court's perfunctory conclusion that the facts here accord with prior decisions of this Court granting qualified immunity is legally unsupportable. As an initial matter, despite its pronouncement that the circumstances here are *"in line with the many Eleventh Circuit cases that have found that similar uses of force were reasonable during an individual's detention,"* the District Court cited but a single case, *Horn v. Barron*, 720 F. Appx. 557 (11th Cir. 2018). But even that precedent is plainly distinguishable from the circumstances here. In *Horn*, for instance, the defendant officer had arrested the plaintiff, thereby permitting the officer to effectuate a full custodial arrest. *Id*. 563 (citing *Ferraro*, 284 F.3d at 1196). In contrast, there was no arrest here. Indeed, there was no criminal offense nor otherwise wrongful conduct here.

Additionally, in *Horn* the plaintiff *"was admittedly 'pissed off' and shouting obscenities about being removed from [a] concert [venue]"* before any physical encounter with police occurred. *Id.* The plaintiff had also been accused by two fellow patrons of assaulting them, one claiming that the plaintiff had grabbed her around the throat and the other displaying a bloody nose and contusions in her eye area. *Id.*

at 559. As a result, the Court found that the defendant officer *"could think [that the plaintiff] posed a threat to himself, other officers, and other concert-goers, especially in light of the plaintiff's "prior volatile and aggressive behavior." Id.* at 565.

The facts in *Horn* are strikingly dissimilar from the events that unfolded here, where Appellant, after awakening in the backseat of her mother's car, spent approximately 10 minutes or more being questioned by police officers and medical personnel. Although she began crying when officers presented her with an ultimatum forcing her to choose between being taken to the hospital by the police or by emergency medical crew members, she was hardly volatile or aggressive, as the plaintiff in *Horn* was. *Id.* Indeed, as referenced several times above, the District Court itself found that Appellant posed no danger to the officers and had made no threatening moves towards Officer Phillips. (Dkt. No. 110 at p. 25.) In the moments before Officer Phillips grabbed her, Appellant appeared composed and, in a conversational tone, informed Officer Pena, *"excuse me, I need to use the restroom."* She then repeated that statement as she turned to the house only to see Officer Phillips blocking her way, to whom she repeated that she needed to go to the bathroom. Unlike *Horn*, where tempers were already flaring and the actors were highly agitated, excusing oneself to use the restroom is hardly a prelude to danger or grounds for applying force.

Finally, the Court in *Horn* characterized the force used as *de minimis*. 720 F. App'x at 564. In that case, the defendant officer, after determining that he would take the plaintiff into custody, used a *"soft hands, straight arm bar takedown technique in order to gain control of [the plaintiff],"* a method that made use of *"gravity and his own weight"* in bringing a suspect to the ground. *Id.* at 560. The plaintiff claimed that her arm broke *"when she hit the ground." Id.*

That was not the case here, where Officer Phillips used brute strength to wrench Appellant's arm behind her, in what was described in the police report authored by Officer Pena as a Kimura arm lock, an action carried out so forcefully as to fracture her humerus.[6] Although the focus in an excessive force claim is on the force used rather than the injury ultimately sustained, it cannot be said that Officer Phillips used *de minimums* force when he twisted Appellant's arm so forcefully that he – not gravity or his weight or the ground – splintered a bone measuring nearly an inch thick. *See*, *e.g.*, *Wilkins v. Gaddy*, 599 U.S. 34, 39 (2010) ("Although we once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed") (emphasis in original). *See also Ruiz-Zaragoza v. Kruse*, No. 19-cv-255, 2024 U.S.

---

[6]    A Kimura arm lock is a MMA and Jiu Jitsu submission arm bar technique that causes intense pain to the recipient in which *"countless combatants indeed reported broken arms and dislocated shoulders after they were subject to the Kimura lock"*
https://www.elitesports.com/blogs/news/kimura-lock-the-ruthless-bjj-submission-technique?srsltid=AfmBOoprcwFI39xp-r5aQNLey_ImdEY2qUgG0EJy4Kg6MbaZk6KahtDF

Dist. LEXIS 66998, *14-15 (M.D. Fla. Apr. 12, 2024) (*"even if Plaintiff sustained only one broken finger, that itself does not establish excessive force was not used."*) (citing *Lee*, 284 F.3d at 1200 for the proposition that *"objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm"*).

Accordingly, the court's reliance on *Horn* undermines rather than supports its determination that Officer Phillips's conduct was reasonable. This is especially so in light of the guidance that because reasonableness is not capable of precise definition of mechanical application, and where its proper application is dependent on *"careful attention to the facts and circumstances of each particular case." Graham*, 490 U.S. at 396 (internal quotation marks omitted).

## II.   Appellees Unlawfully Detained Appellant in the Absence of Any Indication that Appellant was a Danger to Herself or Others and in Violation of Georgia's Mental Health Law

A claim of unlawful seizure arises under the Fourth Amendment. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). For Fourth Amendment purposes, a seizure *"occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." May v. City of Nahunta*, 846 F.3d 1320, 1327 (11th Cir. 2017). *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). A seizure is characterized by a reasonable individual's belief that they are not free to terminate the encounter with

a governmental actor. *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). An officer is permitted to make a seizure, including an arrest, when they have probable cause, *i.e.*, where the facts and circumstances [are] sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. *Crosby*, 394 F.3d at 1332 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). An officer acting with appropriate probable cause is entitled to qualified immunity against claims of a Fourth Amendment violation. *See id.*

The courts have further held that the seizure of an individual is permissible, and qualified immunity may *attach, where an officer possesses "arguable probable cause." Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Arguable probable cause may arise where an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed. *Dorothy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003). *See also Crosby*, 394 F.3d at 1332 (*"Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could – not necessarily would – have believed that probable cause was present."*).

A subset of Fourth Amendment cases involves what the Court has termed a "mental-health seizure" wherein an officer, under certain circumstances, stops an individual to ascertain that person's mental state (rather than to investigate suspected criminal activity). *May*, 846 F.3d at 1327; *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011). In such instances, an officer must possess probable cause *"to*

believe the person is dangerous either to himself or to others." *Roberts*, 643 F.3d at 905. *See also May*, 846 F.3d at 1328 (requiring only arguable probable cause *"to seize [the plaintiff] for a psychological evaluation"*); *Ingram*, 30 F.4th at 1250. *"[A] showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." Roberts*, 643 F.3d at 905-906.

Here, the District Court found that Appellant, despite having committed no crime and having not been arrested, was nevertheless seized by Appellees. (Dkt., No. 110 at pp. 19, 22, 24.) The court characterized Appellant's detention as a *"mental-health seizure"* and cited to the National Institute of Mental Health for the proposition that *"substance use disorder is a mental disorder that can lead to dangerous outcomes."* (Dkt. No. 110 at p. 20, n. 17.) The basis for the seizure, according to the court, was Officer Phillips's *"arguable probable cause to believe that [Appellant] was a danger to herself."* (Dkt. No. 110 at p. 20.) The District Court relied on *May* in finding that Appellees' actions in seizing Appellant were reasonable, noting a similarity between the facts in that case and the circumstances that unfolded in the driveway of Appellant's aunt's home. Specifically, the District Court noted that, as in *May*, Appellees were responding to a 911 call, had been informed that Appellant was possibly engaged in behavior dangerous to herself

(drug use), and that Appellant's family did not object to her being taken to the hospital. (Dkt. No. 110 at pp. 21-22.)

But as with the District Court's evaluation of Appellant's excessive force claim, its analysis here falls short and its ruling must be reversed. First, the facts here are distinguishable from those in other precedents of this Court. In *Ingram*, for example, the plaintiff was a military veteran who had been diagnosed with post-traumatic stress disorder. *See* 30 F.4th at 1247. After he underwent a crisis and cut his wrist, his girlfriend called the police. *Id.* Officers arrived and, after they confiscated the knife, the plaintiff told them that he was not suicidal and asked if he was under arrest. *Id.* The officers told the plaintiff he was not under arrest but continued to question him. *Id.* When they did not leave, the plaintiff ran out the back door and into a field, prompting the officers to chase him. *Id.* After he stopped and the officers caught up to him, they walked back to the house where the plaintiff spoke with medical personnel, declining treatment. *Id.*

On the basis of these facts, the Court found that the officers were justified in seizing the plaintiff because they had probable cause that he was a danger to himself. *Id.* at 1250. The Court determined that the officers were not obligated to believe the plaintiff's statement that he was not suicidal and did not intend to harm himself. *See id.* It further found that:

> "It was objectively reasonable for [the officer] to believe
> that [the plaintiff] might still be in need of immediate aid

> *even though he was not actively trying to kill himself,*
> *because he had recently attempted to do just that."*

*Id.* (internal quotation marks and citation omitted). The Court also noted that the plaintiff exhibited erratic behavior when he sought to evade the deputies and isolate himself in a cotton field. *Id.*

Here, it is beyond dispute that Appellant did not behave in ways similar to that of the plaintiff in *Ingram*. Although Appellant's mother had told Appellees that she had been unable to rouse her daughter from the back seat of her car and suspected that Appellant had taken GHB, there was no evidence of any suicidal action such as a slashed wrist. And unlike in *Ingram*, Marbut was not acting erratically. Although she began crying when she was told that she had no choice but to go to the hospital, that is hardly akin to dashing off into a field causing officers to give chase. Appellant continued to respond to the questions directed at her by officers and medical personnel until she told them that she needed to use the restroom, at which time Officer Phillips made his unlawful seizure.

The facts here are also dissimilar to those in *May*, the case principally relied on by the District Court. In that case, the plaintiff's brother called 911 when he was unable to awaken the plaintiff, who suffered from "caregiver breakdown and Pick's disease, which she described as cerebral atrophy, or shrinking of the brain, accompanied by symptoms of headaches and seizures." 846 F.3d at 1325. Emergency medical technicians ("EMTs") "arrived and woke the Plaintiff, who then

refused treatment. *See id.* Thereafter, a police officer who had been alerted by a 911 call arrived. *See id.* He was told by EMTs that the plaintiff had been *"a little combative to herself"* and was *"clasping her fists and scuffing and hitting herself in the head." Id.* (internal quotation marks omitted). The officer then entered the plaintiff's bedroom where he observed *"that her hair was all over her head in disarray." Id.* (internal quotation marks omitted). The officer then seized the plaintiff in order to transport her to the hospital for a psychological evaluation. *Id.* Based on these facts, the Court found no violation of the Fourth Amendment.

Unlike the plaintiff in *May*, Appellant here displayed no acts of self-abuse such as hitting herself in the head. 846 F.3d at 1325. She was responsive to the questions being directed at her from police officers and emergency medical crew members. Although, as discussed above, she began crying when told that she had no choice but to go to the hospital, her conduct was nonetheless rational. Additionally, although Appellant's mother suggested that Appellant may have ingested GHB, no one had any knowledge as to whether she had taken any drugs.

*Roberts* is also distinguishable. In that case, an officer was summoned in response to a 911 call to respond to a home whose occupant had a history of suicide attempts and was on medication for treatment of bipolar disorder. 643 F.3d at 902. A relative of the plaintiff informed the officer that she had been trying without success to make contact with the plaintiff for an hour by knocking on the plaintiff's

door. *Id.* When the officer pushed open a rear door to determine if the plaintiff was present, the plaintiff began yelling at him to get out, using expletives and calling him "boy." *Id.* She also threatened the officer. *Id.* When the officer finally was able to escort the plaintiff from the house, he sat her down on some steps and questioned her. *Id.* The questioning lasted approximately five minutes before the officer concluded that plaintiff was not threatening self-harm. *Id.* at 906.

In contrast to the plaintiff in *Roberts*, Appellant here did not have a history of suicide attempts and was not suffering from a psychiatric disorder. She also was not verbally abusive toward the police or medical personnel and she made no threats. Although Appellees were entitled to believe the information they were provided by Appellant's mother, who expressed concern about the possible ingestion of GHB, there was no basis to reasonably conclude that there was a probability or substantial chance of dangerous behavior by Appellant. *Id.* at 906. Indeed, the facts here demonstrate that at the time of Appellant's seizure by Officer Phillips, she had been moving around and conversant for nearly ten minutes, a clear demonstration that she was not engaging in dangerous behavior. In direct contrast to *Roberts*, where the need for a mental-health detention ended when the officer determined within five minutes that the plaintiff was not threatening self-harm, the seizure of Appellant took place *after* it was apparent that Appellant posed no threat to herself. Officer Phillips,

to the extent he was paying attention, could see with his own eyes and hear with his own ears that Appellant was not engaging in danger behavior.

The cases cited by this Court in *Roberts* are similarly instructive. In *Cloaninger v. McDevitt*, 555 F.3d 324, 328 (4th Cir. 2009), police responded to a request for a welfare check on the plaintiff, who had reported an adverse reaction to medication to his hospital. The police had been informed that the plaintiff had previously threatened suicide and that firearms had been found at his home. After police arrived, the plaintiff requested to be taken to the hospital but officers responded that they were only there to check on his condition. *See Id.* The plaintiff refused them entry. *Id.* When a supervising officer arrived and again requested to check on the plaintiff but refused his demand to take him to the hospital, the plaintiff threatened to kill the officers and himself. *Id.* The officers first checked with the hospital and learned that the plaintiff had a history of threatening suicide. *See Id.* They then decided to obtain an emergency commitment order from a magistrate and remained at the scene owing to the potential for danger. *Id.* Thereafter, when the plaintiff stuck his arm out of his door an officer grabbed it. *Id.* As the plaintiff attempted to retreat into his home, he pulled the officer inside with him, along with a second officer, and the three of them wrestled until the police gained control and cuffed the plaintiff. *Id.*

In considering the plaintiff's claim of unlawful seizure, the Fourth Circuit found that officers have probable cause to seize a person for a psychological evaluation when *"the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." Id.* at 334. (internal quotation marks omitted). Within the specific context of that case, the Court determined that the plaintiff's prior suicide threats – to which police had responded and discovered firearms – the information obtained from the hospital confirming those prior suicide threats, and the magistrate's agreement *"that an emergency commitment was an appropriate action"* sufficed to authorize a detention for the purposes of a psychological evaluation. *Id.* Indeed, the facts were such as to permit a seizure within the home. *Id.*

The circumstances in *Cloaninger* are meaningfully distinct from those here. Appellant made no threats to harm anyone, herself included. There was no confirmatory information from a medical professional as to Appellant's medical history involving drug use or anything else. And there certainly was no discussion with a magistrate sanctioning a seizure of Appellant. At bottom, the facts here are so thin as to require a finding that Officer Phillips's violent seizure of Appellant cannot pass constitutional muster. *Id.* at 334.

43

Finally, in *Monday v. Oullette*, 118 F.3d 1099, 1100 (6th Cir. 1997), the plaintiff, who was going through a divorce and had a long history of drug and alcohol abuse, had called a psychologist and said that he was depressed and was taking prescription Xanax and drinking alcohol. The psychologist, concerned that the plaintiff could suffer harm by mixing alcohol and drugs called the police who dispatched officers to the plaintiff's home. *Id.* at 1101. The officers, who had been informed that someone was committing suicide entered the plaintiff's home and asked him if he was taking pills. *Id.* Upon discovering that twenty pills were missing, the officers asked the plaintiff to go with them to the hospital. *Id.* When plaintiff refused, the officers told him that he would be pepper sprayed if he did not come willingly, *See id.* The plaintiff continued to refuse and resumed drinking. *Id.* After the plaintiff was pepper sprayed, he was taken to the hospital. *Id.*

After determining that *"a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior,"* the Sixth Circuit deemed the officer's conduct to be lawful. *Id.* at 1102. It reasoned that the officer *"had probable cause to believe that plaintiff was attempting to commit suicide, or at least might injure himself if not taken to a hospital." Id.* The Court further explained that the officer was responding to a radio dispatch that recounted the plaintiff's conversation with the psychologist, the plaintiff was upset over his divorce, and that he was taking

pills and drinking alcohol in an effort to commit suicide. *See id.* More than that, when the officer entered the home, he saw the *"plaintiff in fact was drinking alcohol and appeared intoxicated and depressed. A count of his Xanax pills by the officers revealed that at least twenty were missing." Id.*

Again, the facts in *Monday* are inapposite to what transpired in the driveway of Appellant's aunt's home. They are, in a word, far more robust in setting forth acceptable grounds for a mental-health detention. At the risk of belaboring the point, Appellant neither threatened self-harm nor was she observed harming herself. She was upright and responding to questions posed to her for several minutes before the unlawful seizure took place. Moreover, unlike in *Monday*, where a psychologist initiated a call to police and raised a concern that the plaintiff could kill himself, AMT Pitts informed the officers that, based on what she had observed, they had no basis to take her against her will to the hospital. (Dkt. No. 82, Collier BWC at 1:02) (*"We would like to take her so she can be evaluated but if she can tell us who she is and answer all of our questions properly then technically we are **not** allowed to take her."*)(emphasis added).

The cases discussed above, thus, set forth much more substantial obstacles to performing a mental-health seizure than the District Court appreciated. There must be a greater showing of an individual's threat of self-harm, for instance, and evidence of an individual's ability to converse and respond to questions cautions against

detention. Further, the input of a medical professional is warranted, especially where there is no urgency. Here, there was nothing preventing the police or emergency medical personnel from discussing the matter with a physician.

Under Georgia's Mental Health Law, an officer is permitted under limited circumstances to *"take any person to a physician within the county or an adjoining county for emergency examination by the physician, as provided in 42 U.S.C. §§ 37-3-41, or directly to an emergency receiving facility."* O.C.G.A. § 37-3-42(a)(1). The officer may do so *"if (i) the person is committing a penal offense, and (ii) if the peace officer has probable cause for believing that the person is a mentally ill person requiring involuntary treatment." Id.* . Georgia law further authorizes an officer to take any person to an emergency receiving facility if: (i) the peace officer has probable cause to believe that the person is a mentally ill person requiring involuntary treatment; and (ii) the peace officer has consulted either in-person or via telephone or telehealth with a physician, as provided in O.C.G.A.. § 37-3-41, and the physician authorizes the peace officer to transport the individual for an evaluation." O.C.G.A. § 37-3-42(a)(2).

Here, Appellees lacked probable cause – or even arguable probable cause – permitting them to seize Appellant under Georgia law. In the first instance, it is beyond dispute that they did not observe her *"committing a penal offense."* They also lacked any basis to conclude that Appellant was a *"mentally ill person."*

46

Instead, they were told by Appellant's mother that she thought her daughter had ingested GHB. The mother made no reference to Appellant's suffering from mental illness. Additionally, pursuant to O.C,G.A. § 37-3-42(a)(2), there is no evidence of a call by an officer, or anyone else, to consult a physician. Rather, the only reference to consulting a medical professional is the false testimony by Officer Phillips that a paramedic ordered Appellant to be taken to the hospital. (Dkt. No. 67 at pp. 30:1-31:12.) *See, e.g., Macuba v. DeBoer,* 193 F.3d 1316, 1323 (11th Cir. 1999) (court may only consider admissible evidence in adjudicating a motion for summary judgment). But as that fact remains in dispute, it may not be relied on here. (Dkt. No. 110 at p. 4.) Further, when Officer Collier told AMT Pitts that she should *"call the Doc, he's the boss,"* he received no reply.

For all of the above reasons, the District Court's grant of summary judgment on Appellant's unlawful seizure claim must be reversed.

### III. The District Court Erred in Dismissing Appellant's Claim that Appellees Failed to Intervene to Prevent the Use of Excessive Force Against Her

A claim that police officers failed to intervene to prevent an excessive force violation arises, as with Appellant's other federal claims, under the Fourth Amendment. *See, e.g., Priester v. City of Riviera Beach,* 208 F.3d 919, 024 (11th Cir. 2000) (finding that "an officer can be liable for failing to intervene when another officer uses excessive force"); *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341

(11th Cir. 2007) (*"an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance"*) (quotation marks omitted).

Here, the District Court granted Appellee's motion for summary judgment of Appellant's failure to intervene claim, reasoning that because Officer Phillips did not use excessive force, the other Appellees had no obligation to intervene. (Dkt. No. 1010 at p. 34.) But as demonstrated at length above, the court's ruling on Appellant's excessive force claim was error. As a result, upon remand to the District Court, the failure to intervene claim should be re-instituted. *See Williams v. Corr. Officer Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023) (reversing the lower court's dismissal of excessive force claim and remanding plaintiff's failure to intervene claim for reconsideration).

## CONCLUSION

The District Court erred as a matter of law when it granted Appellees qualified immunity and their motion for summary judgment on Appellant's claims of excessive force, unlawful seizure, and failure to intervene. Based on the foregoing, Appellant requests that this Court reverse the District Court's Opinion and Order dismissing Appellant's claims and reinstate the case for further proceedings.

Dated:      December 24,  2024       Respectfully submitted,

**WAYNE B. KENDALL, P.C.**
*s/ Wayne B. Kendall*
WAYNE B. KENDALL
Georgia Bar No.: 414076
wayne@waynebkendallpc.com

155 Bradford Square, Suite B
Fayetteville, GA 30215
(678) 884-6084


**THE REEVES LAW FIRM, LLC**

The Reeves Law Firm, LLC
P.O. Box 544
Experiment, GA 30212
Telephone: (678) 727-6956

*s/ Jeffrey Reeves*
JEFFREY REEVES
Georgia Bar No. 940541
jareeveslaw@gmail.com

*Attorneys for Plaintiff*

## CERTIFICATION OF COMPLIANCE

The undersigned certifies that this Brief complies with the applicable type volume limitations in Rule 32(a)(7). This brief contains 11,432 words, and 926 lines, including footnotes, and exclusive of the components that are excluded from the word count limitation in Rule 32(f). This certificate was prepared in reliance upon the word-count function of the word processing system (Microsoft Word) used to prepare this brief. This brief complies with the typeface and type style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using font size 14 Times New Roman.

This 24th day of December 2024.

/s/ *Wayne B. Kendall*
Wayne B. Kendall
Georgia Bar No. 414076
**Wayne B. Kendall, P.C.**
155 Bradford Square, Suite B
Fayetteville, GA 30215
Telephone: (770) 778-8810
Facsimile: (770) 716-2439
Email: wbkendall2@yahoo.com

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that I have served each of the parties with a copy of this document by filing it with this Court via the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record.

This 24th day of December 2024.

/s/ *Wayne B. Kendall*
Wayne B. Kendall
Georgia Bar No. 414076
**Wayne B. Kendall, P.C.**
155 Bradford Square, Suite B
Fayetteville, GA 30215
Telephone: (770) 778-8810
Facsimile: (770) 7162439
Email: wbkendall2@yahoo.com

Counsel for *Appellant*